Vito J. Tito he, J.
The petitioners are a student at Junior
High School 27 and his mother. They seek an order directing respondent Board of Education of the City of New York to hold classes as usual on October 15, 1969 and such other relief as the court deems appropriate. On October 8, 1969, the respondent issued a statement declaring that teachers and pupils who wish, as a matter of conscience, to participate in planned programs outside the schools would be permitted to do so, and the pupils would not be penalized for their absence; the teachers are permitted to charge the day against their personal business allowance. The programs referred to are the so-called Viet Nam “ war moratorium ” for which October 15 has been designated. The petitioners assert that this action of the Board of Education violates their right of freedom of speech under the First and Fourteenth Amendments to the United States Constitution in that it places the affirmative support of government behind .a controversial political hypothesis, and that it illegally compels the infant petitioner to profess his views on this conflict.
The issue before this court is whether or not the Board of Education of the City of New York has the power to act in an area so touching upon matters of opinion and political attitude. The court thinks it has not. No one takes issue with the fact that the Viet Nam War question comes high in the order of priority, and that it is an emotional and controversial and moral matter. There is no argument with the fact, nor is there an issue before the court, as to whether or not we are all involved in this. However, the propriety of the issue, emotion, involvement, good intent, etc., cannot be allowed to cause us to turn our backs on our constitutional heredity and allow the slightest breach of our personal liberties in the name of good intent or honest effort.
The board has stated that during the so-called Viet Nam “War Moratorium” on October 15, 1969, no pupil will be required to attend school, although absences will be noted, and that all teachers may refrain from their duties that day, although it will be charged against personal leavé, if in good conscience *62 they are opposed to the Viet Nam War, without penalty. The element of compulsion is clear. Students and teachers who do not attend school that day will be deemed to be against the Government’s Viet Nam War policy, and those who attend will be assumed to favor such policy. It forces people to take a position when, as a matter of constitutional law, they are not required to do so.
The case of Board of Educ. v. Barnette (319 U. S. 624) is in point. There, the Supreme Court held unconstitutional a resolution of a Board of Education that required all public school students to recite the pledge of allegiance to the flag. The petitioners in that case objected to the recitation on religious grounds and claimed that it violated their right to freedom of speech. After observing that it was dealing ‘ ‘ with a compulsion of students to declare a belief ” (319 U. S., at p. 631) the court said (319 U. S., at p. 638): “The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to .place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One’s right to life, liberty, and property, to free speech, to free press, and freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections.”
The court also said (319 U. S., at p. 642):
“ If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion, or force citizens to confess by word or act their faith therein. If there are any circumstances which permit an exception, they do not now occur to us.
“We think the action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirt which it is the purpose of the First Amendment to our Constitution to reserve from all official control.”
Highly pertinent to the instant case is the following from the concurring opinion of Mr. Justice Murphy (319 U. S., at p. 645): “ The right of freedom of thought and of religion as guaranteed by the Constitution against State action includes both the right to speak freely and the right to refrain from speaking at all, except insofar as essential operations of government may require it for the preservation of an orderly society, as in the case of compulsion to give evidence in court. * * * To many, it is deeply distasteful to join in a public chorus of affirmation of private belief,”
*63 Those people who are strongly against this country’s Viet Nam involvement have a constitutional right to remain silent; some of these might prefer to attend school on October 15, rather than participate in any visible demonstration favoring their position. Yet, their school attendance could be interpreted as supporting the very view they oppose. Similarly, those who support the Government’s present Viet Nam stance are not required to make their views known. Members of this group also may wish to attend school for the sake of receiving an education and not as a show of their support for the war. Nevertheless, the action of the board compels the implication that those who attend school on October 15 support the Viet Nam war. Similarly, there may be those for and against the Government’s policy who are ill on October 15, 1969, and are physically unable .to attend school. The implication will be that they support the ‘ ‘ moratorium ’ ’ and are opposed to the war. All these groups are being pressured to reveal their position by the board’s action.
Equally important are those who fear for the safety of their children, both because of the anticipated absence of supervisory personnel at the school and the real possibility of demonstrators, picket lines, and the like, in school areas.
There is a further and more compelling reason why the board’s action cannot stand. The board has relegated to itself the power to determine what is or is not a momentous 11 Issue ’ ’ of great moral magnitude, apparently thereby justifying the action it has taken. Its own statement, as shown in its opposing papers, begins: u The Board of Education and the Acting Superintendent of Schools recognize the universal desire of the American people to end the war in Viet Nam. We also recognize that there are differences among the people and their leaders as to how this can best be achieved.” It is no business of the board td “ recognize ” the desires or differences of the American people.
The action of the board falls within conduct proscribed by the Supreme Court in Engel v. Vitale (370 U. S. 421) which declared that recitation of the so-called regents’ prayer violated the First Amendment clause prohibiting an establishment of religion. The prayer was composed by the New York State Board of Regents and was recited on a voluntary basis at the beginning of each school day. The court pointed out that as a matter of history the very practice of establishing govern-mentally-eomposed prayers was one of the reasons which caused our early forebears to emigrate from England to this country, and that it was part of the basis for the establishment clause *64 in our Constitution. The court referred to the Book of Common Prayer and stated (370 U. S., at p. 426): “ The controversies over the Book and what should be its content repeatedly threatened to disrupt the peace of that country [England] as the accepted forms of prayer in the established church changed with the views of the particular ruler that happened to be in control at the time.”
The same result would occur if the Board of Education were permitted to determine what issues and controversies merited some sort of participation or observance or action by the public schools in various and sundry causes. This determination would depend upon the political outlook of the board members at a particlular time. Indeed, it is entirely possible that a year from now participation in a demonstration in support of the Government’s Viet Nam policy would be declared. The point is clear: government may not thus involve itself in such controversial matters or moral issues. The following excerpt from the Matter of Appeal of American Civ. Liberties Union (36 N. Y. State Dept. Rep. 87, 97-98) is appropriate: ‘1 The public schools are supported by the whole body of citizens; within their walls assemble the children of the rich and the poor, the children of parents of every shade of religious belief and unbelief, the children of almost every race and color. Therefore, nothing that will tend to foster intolerance, bigotry, animosity or dissension should be allowed to inject itself into the public school system of this great State ”,
The prestige and power of the Board of Education may not be used to support, influence or condone, on matters of this nature.
There is a practical problem also, namely, where does this sort of thing end? For example, the leaders of this 1 ‘ moratorium ” publicize their intention of having a two-day moratorium next month, and three days the month after that. The board may very well find itself morally committed to allow students to participate, as in the instant case.
Students would quickly get the impression, if they have not already, that they have total freedom, by official edict, to move about and participate in whatever they, in “ good conscience ”, feel right at any time, and absent themselves from school in so doing. An implication might arise, contrary to State law, that attendance in school is secondary to their right to participate in causes morally worthwhile in their minds.
The respondent contends that it is in fact observing normal attendance regulations in that there is no punishment or penalty for a one-day absence. Then it states: “ Attendance records *65 are considered by colleges and employers and for purposes of school awards. It is self-evident that a pupil with a poor record will be hindered thereby.” The board failed to warn the students of these possibilities in its statement of October 8,1969. Also, if attendance records are available to employers and others, as respondent states, a prospective employer could check specifically to determine whether or not a person was absent on this highly publicized day, October 15, 1969, and might draw an inference about that person’s politics. The harm is obvious.
The respondent’s contention that the petitioners lack standing is without merit (Matter of Engel v. Vitale, 18 Misc 2d 659, affd. 11 A D 2d 340, 10 N Y 2d 174 revd. 370 U. S. 421), as is their assertion that the petition fails to state a cause of action (Board of Educ. v. Barnette, 319 U. S. 624, supra).
Accordingly, the court orders that the respondent shall forthwith issue a statment or directive rescinding its statement or directive of October 8, 1969 and also stating that the public schools will conduct their usual and normal school day on October 15,1969.